**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**CENTRAL ISLIP DIVISION**

| | |
|---|---|
| CHRISTOPHER LARIBEE, Individually and For All Others Similarly Situated<br><br>    v.<br><br>PREMIER INFRASTRUCTURE & ENERGY LLC | Case No. _____<br><br>Jury Trial Demanded<br><br>Rule 23 Class Action<br>FLSA Collective Action |

## ORIGINAL CLASS & COLLECTIVE ACTION COMPLAINT

### SUMMARY

1.      Christopher Laribee ("Laribee") brings this class and collective action to recover untimely wages, overtime wages, and other damages from Premier Infrastructure & Energy LLC ("Premier").

2.      Premier is a utility locating service provider that employs numerous people in New York State, a majority of whom are "manual workers" as contemplated by Section 191 of the New York Labor Law ("NYLL").

3.      For example, Premier employed Laribee as one of its Hourly Utility Locators (defined below) in and around Onondaga and Oneida Counties, New York.

4.      Despite being manual workers, Premier failed to properly pay Laribee and its other Hourly Utility Locators their wages within seven calendar days after the end of the week in which they earned such wages.

5.      Instead, Premier uniformly paid Laribee and its other Hourly Utility Locators on a bi-weekly basis.

6.      In this regard, Premier failed to timely pay earned wages to Laribee and its other Hourly Utility Locators.

7.      As manual workers, Laribee and the other Hourly Utility Locators are "dependent upon their wages for sustenance." *See People v. Vetri*, 309 N.Y. 401, 405 (1955).

8.      Accordingly, Premier's failure to timely pay wages owed to Laribee and the other Hourly Utility Locators constitutes an "especially acute injury" under NYLL § 191. *See Caul v. Petco Animal Supplies, Inc.,* No. 20-CV-3534 (RPK) (SJB), 2021 WL 4407856, at *4 (E.D.N.Y. Sep. 27, 2021) (citing *Vega v. CM & Assocs. Constr. Mgmt., LLC*, 175 A.D.3d 1144, 1146 [N.Y. 1st Dept. 2019]).

9.      In addition to failing to timely pay Laribee and the other Hourly Utility Locators their earned wages, Premier also fails to pay them for all their hours worked.

10.     Instead, Premier requires Laribee and the other Hourly Utility Locators to work significant time "off the clock" without pay.

11.     Specifically, Premier prohibits Laribee and the other Hourly Utility Locators from clocking in for their shifts until they arrive at their first assigned ticket; and Premier requires Laribee and the other Hourly Utility Locators to clock out for their shifts when they leave their last assigned ticket (Premier's "ticket to ticket policy").

12.     But to meet Premier's strict productivity requirements, Laribee and the other Hourly Utility Locators are forced to perform their regular utility locating duties "off the clock" before arriving to their first assigned ticket and after leaving their last assigned ticket.

13.     Laribee and the other Hourly Utility Locators are thus not paid for the time they spend performing this pre- and post-ticket work "off the clock."

14.     Premier's uniform "ticket to ticket" policy violates the Fair Labor Standards Act ("FLSA") and the NYLL by depriving Laribee and the other Hourly Utility Locators of overtime wages for all overtime hours worked.

15.     Similarly, Premier also requires these workers to clock out for 30 minutes a day for so-called "meal breaks" (Premier's "meal break policy").

16.    Premier therefore does not pay Laribee and its other Hourly Utility Locators for that time.

17.    But Laribee and the other Hourly Utility Locators do not actually receive *bona fide* meal breaks.

18.    Instead, to meet Premier's strict productivity requirements, Laribee and the other Hourly Utility Locators are forced to perform their regular utility locating duties "off the clock" during their unpaid "meal breaks" for Premier's predominant benefit.

19.    Premier's uniform meal break policy therefore violates the FLSA and NYLL by depriving Laribee and the other Hourly Utility Locators of overtime wages for all overtime hours worked.

## JURISDICTION & VENUE

20.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this case involves a federal question under the FLSA, 29 U.S.C. § 216(b).

21.    This Court also has supplemental jurisdiction over the state-law subclass claims because these claims arise from a common nucleus of operative facts. 28 U.S.C. § 1367.

22.    This Court has general personal jurisdiction over Premier because Premier is a domestic limited liability company.

23.    Venue is proper because Premier is headquartered in Bohemia, New York, which is in this District and Division. 28 U.S.C. § 1391(b)(1).

## PARTIES

24.    Premier employed Laribee as a Utility Locator in and around Onondaga and Oneida Counties, New York from approximately February 2020 until October 2021.

25.    Laribee was Premier's covered "employee" within the meaning of the FLSA and NYLL.

26.     Throughout his employment, Premier classified Laribee as non-exempt and paid him on an hourly basis.

27.     Throughout his employment, Laribee worked for Premier as a "manual worker" within the meaning of NYLL § 191.

28.     But throughout his employment, Premier failed to timely pay Laribee his wages within seven calendar days after the end of the week in which he earned such wages.

29.     Instead, Premier paid Laribee on a bi-weekly basis in willful violation of the NYLL.

30.     Further, throughout his employment, Premier subjected Laribee to its uniform, illegal "ticket to ticket" and meal break policies.

31.     But throughout his employment, Premier forced Larbee to perform compensable work "off the clock" (without pay) before he arrived at his first ticket, after he left his last ticket, and during his "meal breaks" in willful violation of the FLSA and NYLL.

32.     Laribee brings this class and collective action on behalf of himself and other similarly situated Premier Utility Locators[1] in New York who were subject to Premier's illegal (1) non-weekly pay scheme, (2) "ticket to ticket" policy, and/or (3) meal break policy.

33.     Premier failed to timely pay each of these manual workers their wages within seven calendar days after the end of the week in which they earned such wages.

34.     Instead, Premier paid each of these manual workers on a bi-weekly basis in willful violation of the NYLL.

35.     Further, Premier prohibits each of these Utility Locators from clocking in until they arrive at their first assigned ticket and requires them to clock out when they leave their last assigned ticket.

---

[1] In the utility locating industry, Utility Locators are also referred to as "Line Locators" and "Field Technicians."

36.     And Premier requires each of these Utility Locators to clock out for 30 minutes a day for so-called "meal breaks."

37.     But Premier also requires each of these Utility Locators to perform compensable work "off the clock" (without pay) before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

38.     Thus, Premier uniformly deprives its Utility Locators of overtime wages for all hours worked after 40 in a workweek, including those worked "off the clock," in willful violation of the FLSA and NYLL.

39.     The FLSA Collective of similarly situated employees is defined as:

> **All employees who worked for Premier as hourly Utility Locators who were subject to Premier's (1) "ticket to ticket" policy, and/or (2) meal break policy at any time during the past 3 years (the "FLSA Collective Members").**

40.     Laribee also seeks to represent a class under the NYLL pursuant to FED. R. CIV. P. 23.

41.     The New York Class of similarly situated employees is defined as:

> **All employees who worked for Premier as hourly Utility Locators in New York who were (1) not paid on a weekly basis, (2) subject to Premier's "ticket to ticket" policy, and/or (3) subject to Premier's meal break policy at any time during the past 6 years and 228 days[2] from the filing of this Complaint until final resolution of this action (the "New York Class Members").**

42.     The FLSA Collective Members and New York Class Members are collectively referred to as the "Hourly Utility Locators."

---

[2] This class period is due to Governor Cuomo's Executive Orders that tolled the applicable NYLL statute of limitations during the COVID-19 pandemic for a total of 228 days. *See Brash v. Richards*, 195 A.D. 3d 582, 2021 WL 2213786, 2021 N.Y. Slip Op 03436 (App. Div. 2d Dep't June 2, 2021) (holding executive order tolled rather than suspended statutes of limitations under New York law); *McLaughlin v. Snowlift Inc.*, 71 Misc. 3d 1226(A) (Sup. Ct., Kings Cnty. 2021) (calculating that, together, Governor Cuomo's Executive Orders lasted 228 days).

43.     The Hourly Utility Locators can be readily ascertained from Premier's business and personnel records.

44.     Premier is a New York limited liability company headquartered in Bohemia, New York.

45.     At all relevant times, Premier was, and is, a covered "employer" within the meaning of the FLSA and NYLL.

46.     Premier may be served through its registered agent: **Rocket Corporate Services, Inc., 2804 Gateway Oaks Drive, Suite 100, Sacramento, California 95833**.

**FLSA COVERAGE**

47.     At all relevant times, Premier was an "employer" within the meaning of Section 3(d) of the FLSA, 29 U.S.C. § 203(d).

48.     At all relevant times, Premier was an "enterprise" within the meaning of Section 3(r) of the FLSA, 29 U.S.C. § 203(r).

49.     At all relevant times, Premier was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of Section 3(s)(1) of the FLSA, 29 U.S.C. § 203(s)(1), because Premier has had employees engaged in commerce or in the production of goods for commerce, or employees handling, selling, or otherwise working on good or materials—such as cellphones, computers, vehicles, tools, and personal protective equipment—that have been moved in or produced for commerce.

50.     At all relevant times, Premier has had an annual gross volume of sales made or business done of not less than $1,000,000 each year.

51.     At all relevant times, Laribee and the other Hourly Utility Locators were Premier's covered "employees" within the meaning of Section 3(e) of the FLSA, 29 U.S.C. § 203(e).

52.     At all relevant times, Laribee and the other Hourly Utility Locators were engaged in commerce or in the production of goods for commerce.

53.   Under its uniform "ticket to ticket" policy, Premier prohibits Laribee and the other Hourly Utility Locators from clocking in for their shifts until they arrive at their first assigned ticket and requires them to clock out for their shifts when they leave their last assigned ticket.

54.   Likewise, under its uniform meal break policy, Premier requires Laribee and the other Hourly Utility Locators to clock out for 30-minutes a day for so-called "meal breaks," regardless of whether they actually receive a bona fide meal break.

55.   But Premier also requires Laribee and the other Hourly Utility Locators to perform compensable work "off the clock" before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

56.   As a result, Premier fails to pay Laribee and its other Hourly Utility Locators wages (including overtime) for the compensable work they perform "off the clock" before they arrive at their first assigned ticket, after they leave their last assigned ticket, and during their "meal breaks."

57.   Premier's uniform "ticket to ticket" and meal break policies therefore violate the FLSA by depriving Laribee and the other Hourly Utility Locators of overtime wages for all hours worked after 40 in a workweek. 29 U.S.C. § 207(a) & (e).

## FACTS

58.   Premier provides damage prevention support and underground utility locating services to utility owners and operators in New York.[3]

59.   To meet its business objectives, Premier employs manual workers, including Laribee and the other Hourly Utility Locators, to provide utility locating services to its clients.

60.   While exact job duties and precise locations worked may differ, Laribee and the other Hourly Utility Locators are all subject to Premier's same or similar illegal policies for similar work.

---

[3] *See* https://leveragepremier.com/ (last visited December 14, 2023).

61.     For example, Laribee worked for Premier as a Utility Locator in and around Onondaga and Oneida Counties, New York from approximately February 2020 until October 2021.

62.     Laribee was Premier's hourly employee.

63.     Throughout his employment, Premier required Laribee to report his work time to Premier for approval through its uniform timekeeping and ticketing system.

64.     Throughout his employment, Laribee regularly worked more than 40 hours a week.

65.     Indeed, throughout his employment, Laribee worked 12 to 14 hours a day for 6 to 7 days a week (or 72 to 98 hours a week) "on the clock" each workweek during the spring and summer months, and 8 to 10 hours a day for 5 days a week (or 40 to 50 hours a week) "on the clock" each workweek during the fall and winter months.

66.     Throughout his employment, over 25% of Laribee's duties were physical tasks, including but not limited to: walking, climbing, and crawling around assigned areas while carrying and/or pushing utility locating equipment (e.g., ground-penetrating radar detectors, GPS, spray paint cans, flags, traffic cones, shovels, etc.) to detect underground utilities; marking the locations of underground utilities by painting symbols on, inserting flags into, the ground; digging to expose buried utility lines and digging test holes; assisting construction crews with digging ditches; and standing or otherwise being "on his feet" for extended periods of time.

67.     Despite regularly spending more than 25% of his shift performing these physical tasks, Premier failed to timely pay Laribee his earned wages.

68.     Instead, Premier paid Laribee on a bi-weekly basis.

69.     As a result of Premier's untimely wage payments, Premier underpaid Laribee for the first seven days of each bi-weekly pay period throughout his employment in New York.

70.     Thus, Premier paid Laribee on an untimely basis in willful violation of the NYLL.

71.     For example, for the period beginning on June 13, 2021 and ending on June 26, 2021,

8

Premier did not pay Laribee his lawfully earned wages until July 2, 2021.

72.     In this regard, Premier failed to timely pay Laribee his wages earned from June 13, 2021 to June 19, 2021 not later than seven days after he earned such wages (by June 26, 2021) as required by NYLL § 191(1)(a).

73.     As a result of Premier's untimely wage payments, Premier underpaid Laribee for the entire period of June 13, 2021 to June 19, 2021, and for every corresponding period where Premier paid Laribee on an untimely basis.

74.     Moreover, Premier's underpayments denied Laribee the time-value of his earned wages. *See Freeland v. Findlay's Tall Timbers Distrib. Ctr., LLC*, --- F. Supp. 3d. ---, 2023 WL 4457911, at *7 (W.D.N.Y. July 11, 2023) (holding an employee's "lost time value of his wages" from being paid late was an injury in fact).

75.     For example, Laribee was unable to invest, save, or purchase utilizing the wages he earned during the first seven days of each bi-weekly pay period throughout his employment.

76.     And Premier similarly underpaid Laribee for every workweek it paid his lawfully earned wages more than seven days after the time he completed his work.

77.     Further, in addition to failing to timely pay Laribee his earned wages, Premier also subjected him to its illegal "ticket to ticket" policy.

78.     Specifically, Premier prohibited Laribee from clocking in for his shifts until he arrived at his first assigned ticket and required him to clock out when he left his last assigned ticket.

79.     But Premier also required Laribee to perform compensable work "off the clock" (without pay) before arriving to his first assigned ticket and after leaving his last assigned ticket.

80.     Specifically, to meet Premier's strict productivity requirements, Laribee was forced to review tickets, route plan, make/take calls from Premier's clients, perform mandatory vehicle inspections on his company-issued vehicle, load his utility locating equipment into his company-issued

vehicle, attend round table meetings, drive to Premier's facility to pick up any necessary supplies, and/or drive to his first assigned ticket "off the clock" and without pay.

81.     Likewise, after clocking out upon completing his last assigned ticket, Laribee was forced to drive to Premier's facility to pick up/drop off any necessary supplies, drive home, unload his utility locating equipment from his company-issued vehicle, perform mandatory vehicle inspections on his company-issued vehicle, review tickets, route plan, make/take calls from Premier's clients, attend round table meetings, and/or respond to any emergencies "off the clock" and without pay.

82.     This pre- and post-ticket "off the clock" work took Laribee approximately 2 to 3 hours a day (or 10 to 21 hours a week).

83.     But under Premier's illegal "ticket to ticket" policy, Premier did not pay Laribee for his mandatory and necessary pre- and post-ticket "off the clock" work.

84.     Similarly, throughout his employment, Premier subjected Laribee to its illegal meal break policy.

85.     Specifically, Premier required Laribee to clock out for 30 minutes a day for so-called "meal breaks," regardless of whether he actually received a *bona fide* meal break.

86.     But Laribee did not actually receive *bona fide* meal breaks.

87.     Instead, to complete his heavy workload in accordance with Premier's strict productivity requirements, Laribee was forced to perform his regular utility locating duties "off the clock" during his unpaid "meal breaks."

88.     So, rather than receiving overtime pay for all his hours worked over 40 in a week, under its illegal "ticket to ticket" and meal break policies, Premier only paid Laribee for the time he worked between his arrival at his first assigned ticket and his departure from his last assigned ticket, less his 30-minute on-duty "meal break," in willful violation of the FLSA and NYLL.

89.     Premier subjects its other Hourly Utility Locators to the same illegal non-weekly pay scheme, "ticket to ticket" policy, and meal break policy it imposed on Laribee.

90.     Like Laribee, Premier pays its other Hourly Utility Locators on an hourly basis.

91.     Like Laribee, Premier requires its other Hourly Utility Locators to report their hours worked to Premier for approval via Premier's uniform timekeeping and ticketing system.

92.     Premier's records show that, like Laribee, the other Hourly Utility Locators regularly work more than 40 hours a week.

93.     Indeed, like Laribee, the other Hourly Utility Locators typically work 12 to 14 hours a day for 6 to 7 days a week (or 72 to 98 hours a week) "on the clock" during the spring and summer months, and 8 to 10 hours a day for 5 days a week (or 40 to 50 hours a week) "on the clock" during the fall and winter months.

94.     Premier uniformly subjects its other Hourly Utility Locators to the same policies, procedures, and strict operational and productivity requirements that it imposed on Laribee.

95.     Premier uniformly requires Laribee and the other Hourly Utility Locators to complete their work tickets in a timely manner per Premier's company-wide policy.

96.     Premier uniformly pressures and expects Laribee and the other Hourly Utility Locators to complete as many tickets as possible.

97.     And Premier closely supervises and tracks Laribee's and the other Hourly Utility Locators' productivity through its ticketing system to ensure they comply with Premier's uniform expectations and complete their heavy workloads.

98.     In fact, Premier installs GPS trackers on Laribee's and the other Hourly Utility Locators' company-issued vehicles to monitor all their activities, movements, and locations to ensure they complete their heavy workloads in accordance with Premier's strict productivity and operational requirements.

99.     And like Laribee, the other Hourly Utility Locators perform the same or similar physical job duties.

100.    Like Laribee, over 25% of the other Hourly Utility Locators' duties are physical tasks, including but not limited to: walking, climbing, and crawling around assigned areas while carrying and/or pushing utility locating equipment (e.g., ground-penetrating radar detectors, GPS, spray paint cans, flags, traffic cones, shovels, etc.) to detect underground utilities; marking the locations of underground utilities by painting symbols on, inserting flags into, the ground; digging to expose buried utility lines and digging test holes; assisting construction crews with digging ditches; and standing or otherwise being "on their feet" for extended periods of time.

101.    But like Laribee, despite regularly spending more than 25% of their shift performing these physical tasks, Premier fails to timely pay its other Hourly Utility Locators their earned wages.

102.    Instead, like Laribee, Premier uniformly pays its other Hourly Utility Locators on a bi-weekly basis.

103.    As a result of its untimely wage payments, Premier uniformly underpays its Hourly Utility Locators for the first seven days of each bi-weekly pay period.

104.    Thus, like Laribee, Premier also uniformly pays its Hourly Utility Locators on an untimely basis in willful violation of the NYLL.

105.    And like Laribee, Premier's underpayments similarly deny the other Hourly Utility Locators the time-value of their money, as they are unable to invest, save, or purchase utilizing the wages they earned and are owed during each underpaid workweek.

106.    Accordingly, because Premier uniformly underpays Laribee and its other Hourly Utility Locators for every workweek it pays their lawfully earned wages more than seven days after the time they complete their work, Premier violated Section 191 of the NYLL.

107.    Further, like Laribee, Premier does not pay its other Hourly Utility Locators for all their hours worked.

108.    Instead, like Laribee, the other Hourly Utility Locators are forced to perform compensable work "off the clock" during their "meal breaks" and before and after their shifts without pay to complete their heavy workloads in satisfaction of Premier's strict productivity requirements.

109.    Indeed, Premier subjects its other Hourly Utility Locators to its same illegal "ticket to ticket" policy it imposed on Laribee.

110.    Specifically, Premier prohibits its Hourly Utility Locators (like Laribee) from clocking in for their shifts until they arrive at their first assigned ticket and requires them to clock out for their shifts when they leave their last assigned ticket.

111.    But like Laribee, Premier also requires its other Hourly Utility Locators to perform compensable work "off the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket.

112.    The "off the clock" work Laribee and the other Hourly Utility Locators perform before they arrive at their first assigned ticket and after they leave their last assigned ticket is similar if not the same.

113.    Specifically, before clocking in for their shifts, the other Hourly Utility Locators (like Laribee) are forced to review tickets, route plan, make/take calls from Premier's clients, perform mandatory vehicle inspections on their company-issued vehicles, load their utility locating equipment into their company-issued vehicle, attend round table meetings, drive to Premier's facility to pick up necessary supplies, and/or drive to their first assigned ticket "off the clock" and without pay.

114.    Likewise, after clocking out for their shifts at their last assigned ticket, the other Hourly Utility Locators (like Laribee) are forced to drive to Premier's facility to pick up/drop off necessary supplies, drive home, unload their utility locating equipment from their company-issued vehicles,

perform mandatory vehicle inspections on their company-issued vehicles, review tickets, route plan, make/take calls from Premier's clients, attend round table meetings, and/or respond to any emergencies "off the clock" and without pay.

115. And like Laribee, the other Hourly Utility Locators spend approximately 2 to 3 hours a day (or 10 to 21 hours a week) performing this compensable pre- and post-ticket work "off the clock" without pay.

116. Premier controls Laribee's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work, and this "off the clock" work is undertaken primarily for the benefit of Premier's business of providing utility locating services to its clients.

117. Further, this mandatory pre- and post-ticket "off the clock" work is necessary to the principal work Laribee and the other Hourly Utility Locators perform as Premier Utility Locators.

118. Indeed, Laribee and the other Hourly Utility Locators cannot provide utility locating services to Premier's clients in accordance with Premier's strict productivity and operational requirements unless they perform this pre- and post-ticket "off the clock" work.

119. In other words, Laribee's and the other Hourly Utility Locators' mandatory pre- and post-ticket "off the clock" work is a fundamental requirement of their jobs as Premier Utility Locators.

120. Indeed, Premier could not eliminate this pre- and post-ticket "off the clock" work altogether without impairing Laribee's and the other Hourly Utility Locators' ability to perform their utility locating work.

121. Rather, this mandatory pre- and post-ticket "off the clock" work is integral and indispensable to Laribee's and the other Hourly Utility Locators' work as Premier Utility Locators.

122. Thus, Laribee and the other Hourly Utility Locators routinely perform this mandatory pre- and post-ticket "off the clock" work for Premier's—not their own—predominant benefit.

123.    And Premier knows Laribee and its other Hourly Utility Locators perform this compensable pre- and post-ticket work "off the clock" because Premier requires them to do so.

124.    In fact, Premier closely monitors and tracks Laribee's and the other Hourly Utility Locators' work time and locations via its company-wide ticketing system, GPS trackers, and/or dash cameras to ensure they meet Premier's strict productivity requirements.

125.    Specifically, using timecard details and GPS data tracked by Premier's uniform ticketing system, Premier can easily determine whether Laribee and the other Hourly Utility Locators are working "off the clock" before and after their shifts.

126.    Thus, Premier management level employees can easily determine if Laribee and the other Hourly Utility Locators are clocked out and if their vehicles are moving (and, therefore, they are working or traveling to and from tickets).

127.    And Laribee and the other Hourly Utility Locators repeatedly complained to Premier about being forced to work "off the clock" to complete their heavy workloads in satisfaction of Premier's strict productivity and operational requirements.

128.    But Premier fails to exercise its duty as Laribee's and the other Hourly Utility Locators' employer to ensure they are not performing work that Premier does not want performed "off the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket.

129.    Thus, Premier requested, suffered, permitted, or allowed Laribee and its other Hourly Utility Locators to work "off the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket.

130.    Despite accepting the benefits, Premier does not pay Laribee and its other Hourly Utility Locators for the time they spend performing this compensable work "off the clock."

131.    Thus, under Premier's illegal "ticket to ticket" policy, Laribee and the other Hourly Utility Locators are denied overtime pay for the time they spend performing compensable work "off

the clock" before they arrive at their first assigned ticket and after they leave their last assigned ticket during workweeks in which they work over 40 hours in willful violation of the FLSA and NYLL.

132.    Similarly, Premier also subjects its other Hourly Utility Locators to the same illegal meal break policy it imposed on Laribee.

133.    Specifically, like Laribee, Premier requires its other Hourly Utility Locators to clock out for 30 minutes a day for so-called "meal breaks."

134.    Premier requires Laribee and the other Hourly Utility Locators to clock out for 30 minutes a day regardless of whether they receive a full, uninterrupted meal break.

135.    If Laribee and the other Hourly Utility Locators do not clock out for 30 minutes a day to account for these so-called "meal breaks," Premier will not approve their timesheets.

136.    Premier simply assumes Laribee and the other Hourly Utility Locators receive *bona fide* meal breaks.

137.    But Laribee and the other Hourly Utility Locators do not actually receive *bona fide* meal breaks.

138.    Instead, to complete their assigned heavy workloads in accordance with Premier's uniform, strict operational and productivity requirements (and Premier's close monitoring of the same), Laribee and the other Hourly Utility Locators are forced to perform their regular utility locating duties and responsibilities "off the clock" during their unpaid "meal breaks."

139.    Specifically, during their unpaid "meal breaks," Laribee and other Hourly Utility Locators regularly perform work-related tasks, such as completing tickets, driving from one ticket to another, taking/making calls to Premier's clients, and/or route planning.

140.    The "off the clock" work Laribee and the other Hourly Utility Locators perform during their "meal breaks" is similar if not the same.

141.    Because of these constant work-related tasks, Laribee and the other Hourly Utility Locators are not free to engage in personal activities during their unpaid "meal breaks."

142.    Thus, Laribee and the other Hourly Utility Locators routinely spend their unpaid "meal breaks" performing work "off the clock" for Premier's—not their own—predominant benefit.

143.    This unpaid "off the clock" work is compensable under the FLSA and NYLL because Premier knew, or should have known, that: (1) Laribee and the other Hourly Utility Locators were performing unpaid work during their "off the clock" meal breaks; (2) they were interrupted or subject to interruptions with work duties during any attempted meal break; (3) they were not completely relieved of all duties during their meal breaks; (4) they entirely skipped their meal breaks due to work demands; (5) their meal breaks were less than 20 consecutive minutes; (6) they were not free to engage in personal activities during their meal break because of constant interruptions; and/or (7) they spent their unpaid meal breaks performing their regular utility locating duties for Premier's predominant benefit.

144.    Premier fails to exercise its duty as Laribee's and the other Hourly Utility Locators' employer to ensure they are not performing work that Premier does not want performed "off the clock" during their unpaid "meal breaks."

145.    And Premier knows Laribee and the other Hourly Utility Locators regularly work "off the clock" during their unpaid "meal breaks."

146.    Specifically, using timecard details and GPS data tracked by Premier's uniform ticketing system, Premier can easily determine whether Laribee and the other Hourly Utility Locators are working "off the clock" during their unpaid "meal breaks."

147.    Thus, Premier management level employees can easily determine if Laribee and the other Hourly Utility Locators are clocked out for lunch and/or if their vehicles are moving (and, therefore, they are working or traveling between tickets).

148. Despite accepting the benefits, Premier does not pay Laribee and its other Hourly Utility Locators for the compensable work they perform "off the clock" during their unpaid "meal breaks."

149. Thus, under Premier's illegal meal break policy, Laribee and the other Hourly Utility Locators are denied overtime pay for their on-duty "meal breaks" during workweeks in which they work over 40 hours in willful violation of the FLSA and NYLL.

### PREMIER'S VIOLATIONS WERE WILLFUL AND/OR DONE IN RECKLESS DISREGARD OF THE FLSA AND NEW YORK LAW

150. Laribee incorporates all other paragraphs by reference.

151. Premier knew it was subject to the NYLL and its supporting regulations, including the timely payment of wages provisions.

152. Premier knew the NYLL required it to pay manual workers their lawfully earned wages weekly and not later than seven calendar days after the end of the week in which such wages are earned.

153. Premier knew Laribee and its other Hourly Utility Locators regularly spent more than 25% of their shift performing physical tasks.

154. In other words, Premier knew, should have known, or recklessly disregarded whether Laribee and the other Hourly Utility Locators were "manual workers" under the NYLL.

155. Nonetheless, Premier did not pay Laribee and its other Hourly Utility Locators their lawfully earned wages within seven calendar days after the end of the week in which they earned such wages.

156. Instead, Premier paid Laribee and its other Hourly Utility Locators on a bi-weekly basis.

157.    In other words, Premier knew, should have known, or recklessly disregarded whether it failed to timely pay Laribee and the other Hourly Utility Locators their lawfully earned wages in violation of the NYLL.

158.    Premier's failure to timely pay Laribee and its other Hourly Utility Locators their lawfully earned wages was neither reasonable, nor was Premier's decision to pay these manual workers on a bi-weekly basis made in good faith.

159.    Premier knew it was subject to the FLSA's and NYLL's respective overtime provisions.

160.    Premier knew the FLSA and NYLL required it to pay non-exempt employees, including Laribee and the other Hourly Utility Locators, overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek.

161.    Premier knew Laribee and the other Hourly Utility Locators were non-exempt employees entitled to overtime pay.

162.    Premier knew it paid Laribee and the other Hourly Utility Locators on an hourly basis.

163.    Premier knew Laribee and each Hourly Utility Locators worked over 40 hours in at least one workweek during relevant period(s) because Premier required them to record their hours worked using its timeclock system.

164.    Premier knew the FLSA and NYLL required it to pay employees, including Laribee and the other Hourly Utility Locators, for all hours they performed compensable work.

165.    Premier knew that, as Laribee's and the other Hourly Utility Locators' employer, it had a duty to ensure they were not performing work "off the clock" (without pay) that Premier did not want performed.

166.    Premier knew it prohibited Laribee and the other Hourly Utility Locators from clocking in for their shifts until they arrived at their first assigned ticket.

167.    Nonetheless, Premier knew Laribee and the other Hourly Utility Locators performed compensable work "off the clock" before they arrived at their first assigned ticket.

168.    Likewise, Premier knew it required Laribee and the other Hourly Utility Locators to clock out for their shifts when they left their last assigned ticket.

169.    Nonetheless, Premier knew Laribee and the other Hourly Utility Locators performed compensable work "off the clock" after they left their last assigned ticket.

170.    Thus, Premier knew it requested, suffered, permitted, or allowed Laribee and the other Hourly Utility Locators to work "off the clock" before they arrived at their first assigned ticket and after they left their last assigned ticket.

171.    Premier knew it controlled Laribee's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work.

172.    Premier knew Laribee's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work was undertaken for Premier's predominant benefit.

173.    Premier knew Laribee's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work was necessary to the principal work they performed as Premier Utility Locators.

174.    Premier knew Laribee's and the other Hourly Utility Locators' pre- and post-ticket "off the clock" work was integral and indispensable to their work as Premier Utility Locators.

175.    Thus, Premier knew, should have known, or recklessly disregarded whether Laribee and the other Hourly Utility Locators performed compensable work "off the clock" before they arrived at their first assigned ticket and after they left their last assigned ticket.

176.    Nonetheless, Premier did not pay Laribee and the other Hourly Utility Locators for the compensable work they performed "off the clock" before they arrived at their first assigned ticket and after they left their last assigned ticket.

177.    Premier also knew it required Laribee and the other Hourly Utility Locators to clock out for 30 minutes a day for so-called "meal breaks."

178.    Premier knew Laribee and the other Hourly Utility Locators did not actually receive *bona fide* meal breaks.

179.    Premier knew Laribee and the other Hourly Utility Locators regularly spent their "meal breaks" performing their regular utility locating duties "off the clock" for Premier's predominant benefit.

180.    Thus, Premier knew it requested, suffered, permitted, or allowed Laribee and the other Hourly Utility Locators to work "off the clock" during their "meal breaks."

181.    In other words, Premier knew, should have known, or recklessly disregarded whether Laribee and the other Hourly Utility Locators performed compensable work "off the clock" during their "meal breaks."

182.    Nonetheless, Premier did not pay Laribee and the other Hourly Utility Locators for the work they performed "off the clock" during their "meal breaks."

183.    Thus, Premier knew, should have known, or recklessly disregarded whether it failed to pay Laribee and the other Hourly Utility Locators for all the hours they performed compensable work.

184.    Premier's decision to prohibit Laribee and the other Hourly Utility Locators from clocking in for their shifts until they arrived at their first assigned ticket was neither reasonable, nor was it made in good faith.

185.    Premier's decision to require Laribee and the other Hourly Utility Locators to clock out for their shifts when they left their last assigned ticket was neither reasonable, nor was it made in good faith.

186.    Premier's decision to require Laribee and the other Hourly Utility Locators to clock out for 30 minutes a day to account for "meal breaks" regardless of whether they actually received *bona fide* meal breaks was neither reasonable, nor was it made in good faith.

187.    Premier's failure to pay Laribee and the other Hourly Utility Locators overtime wages for all overtime hours worked was neither reasonable, nor was its decision not to pay these employees overtime wages for all overtime hours worked made in good faith.

188.    Premier knew, should have known, or recklessly disregarded whether its conduct described in this Complaint violated the FLSA and NYLL.

189.    Premier knowingly, willfully, and/or in recklessly disregard carried out its illegal policies that systematically deprived Laribee and the other Hourly Utility Locators of their lawfully earned wages and overtime wages in violation of the FLSA and NYLL.

190.    In sum, Premier's FLSA and NYLL violations were willful, carried out in bad faith, and caused significant damage to Laribee and the other Hourly Utility Locators.

### CLASS & COLLECTIVE ACTION ALLEGATIONS

191.    Laribee incorporates all other paragraphs by reference.

192.    Like Laribee, the other Hourly Utility Locators are uniformly victimized by Premier's illegal (1) non-weekly pay scheme, (2) "ticket to ticket" policy, and/or (3) meal break policy.

193.    Other Hourly Utility Locators worked with Laribee and indicated they were paid in the same manner, performed similar physical work, and were subject to Premier's same illegal non-weekly pay scheme, "ticket to ticket" policy, and/or meal break policy.

194.    Based on his experience with Premier, Laribee is aware Premier's illegal non-weekly pay scheme, "ticket to ticket" policy, and/or meal break policy were imposed on the other Hourly Utility Locators.

195. Laribee and the other Hourly Utility Locators have all been injured in that they have been compensated in an untimely manner due to Premier's common policies, practices, and patterns of conduct.

196. Likewise, Laribee and the other Hourly Utility Locators have all been injured in that they have not been compensated for all their overtime hours worked due to Premier's common policies, practices, and patterns of conduct.

197. Indeed, Premier's corporate-wide policies and practices affected Laribee and the other Hourly Utility Locators similarly.

198. And Premier benefited from the same type of unfair and/or wrongful acts as to each Hourly Utility Locator.

199. The putative class of Hourly Utility Locators includes more than 100 members.

200. Thus, the putative class of Hourly Utility Locators is so numerous that the joining of all class members in one lawsuit is impractical.

201. The Hourly Utility Locators are similarly situated in the most relevant respects.

202. Even if their precise job titles, exact duties, and locations might vary somewhat, these differences do not matter for the purposes of determining their entitlement to their lawfully earned wages and overtime wages for all hours worked over 40 in a week.

203. Rather, the Putative Class is held together by Premier's illegal non-weekly pay scheme, "ticket to ticket" policy, and/or meal break policy, which systematically deprived Laribee and the Hourly Utility Locators of their lawfully earned wages and overtime wages.

204. Premier's records reflect the wages each Hourly Utility Locator earned each workweek.

205. Premier's records also reflect it failed to pay its Hourly Utility Locators their lawfully earned wages within seven days of the time they completed their work.

206.    The untimely wages owed to Laribee and the other Hourly Utility Locators can therefore be calculated using the same formula applied to the same records.

207.    Further, Premier's records reflect the number of hours the Hourly Utility Locators recorded they worked each week.

208.    Premier's records also show the number of hours the Hourly Utility Locators actually worked each week.

209.    And Premier's records further show it required the Hourly Utility Locators to clock out for 30 minutes a day for so-called "meal breaks."

210.    The back wages owed to Laribee and the other Hourly Utility Locators can therefore be calculated using the same formula applied to the same records.

211.    Even if the issue of damages were somewhat individual in character, the damages can be calculated by reference to Premier's records, and there is no detraction from the common nucleus of liability facts.

212.    Therefore, the issue of damages does not preclude class or collective treatment.

213.    And Laribee's experiences are therefore typical of the experiences of the other Hourly Utility Locators.

214.    Laribee has no interest contrary to, or in conflict with, the interests of other Hourly Utility Locators that would prevent class or collective treatment.

215.    Like each Hourly Utility Locator, Laribee has an interest in obtaining the untimely wages and overtime wages owed to them under federal and New York law.

216.    Laribee and his counsel will fairly and adequately represent the Hourly Utility Locators and their interests.

217.    Indeed, Laribee retained counsel with significant experience in handling complex class and collective action litigation.

218.    A class and collective action is superior to other available means for fair and efficient adjudication of this lawsuit.

219.    Absent this class and collective action, many Hourly Utility Locators will not obtain redress for their injuries, and Premier will reap the unjust benefits of violating the FLSA and New York labor laws.

220.    Further, even if some of the Hourly Utility Locators could afford individual litigation against Premier, it would be unduly burdensome to the judicial system.

221.    Indeed, the multiplicity of actions would create a hardship for the Hourly Utility Locators, the Court, and Premier.

222.    Conversely, concentrating the litigation in one forum will promote judicial economy and consistency, as well as parity among the Hourly Utility Locators' claims.

223.    The questions of law and fact that are common to each Hourly Utility Locator predominate over any questions affecting solely the individual members.

224.    The common questions of law and fact include:

a.    Whether Premier paid its Hourly Utility Locators their earned wages on a non-weekly basis;

b.    Whether Premier paid its Hourly Utility Locators their lawfully earned wages on an untimely basis in violation of the NYLL;

c.    Whether Premier engaged in a policy and practice of prohibiting its Hourly Utility Locators from clocking in for their shifts until they arrived at their first assigned ticket;

d.    Whether Premier engaged in a policy and practice of requiring its Hourly Utility Locators to clock out for their shifts once they left their last assigned ticket;

e.   Whether Premier engaged in a policy and practice of requiring its Hourly Utility Locators to clock out for 30 minutes a day for "meal breaks," regardless of whether they actually received a *bona fide*, uninterrupted meal break;

f.   Whether Premier knew, or had reason to know, the Hourly Utility Locators were requested, suffered, permitted, or allowed to work "off the clock" during their unpaid "meal breaks" and/or before they arrived at their first assigned ticket and after they left their last assigned ticket;

g.   Whether Premier failed to pay its Hourly Utility Locators overtime wages for all overtime hours worked, including those worked "off the clock," in violation of the FLSA and NYLL;

h.   Whether Premier's decision not to pay the Hourly Utility Locators their earned wages on a weekly basis was made in good faith;

i.   Whether Premier's decision not to pay the Hourly Utility Locators overtime wages for all overtime hours worked, including those worked "off the clock," was made in good faith; and

j.   Whether Premier's violations were willful.

225.   Laribee knows of no difficulty that will be encountered in the management of this litigation that would preclude its ability to go forward as a class or collective action.

226.   As part of its regular business practices, Premier intentionally, willfully, and repeatedly violated the FLSA and NYLL with respect to Laribee and the other Hourly Utility Locators.

26

227.     Premier's illegal non-weekly pay scheme, "ticket to ticket" policy, and meal break policy uniformly deprived Laribee and the other Hourly Utility Locators of the lawfully earned wages and overtime wages they are owed under the FLSA and New York law.

228.     There are many similarly situated Hourly Utility Locators who have been denied overtime pay in violation of the FLSA who would benefit from the issuance of a court-supervised notice of this lawsuit and the opportunity to join it.

229.     The Hourly Utility Locators are known to Premier and can be readily identified through Premier's business and personnel records.

### COUNT I

### FAILURE TO PAY OVERTIME WAGES UNDER THE FLSA
### (FLSA COLLECTIVE)

230.     Laribee incorporates all other paragraphs by reference.

231.     Laribee brings his FLSA claims on behalf of himself and the other FLSA Collective Members pursuant to 29 U.S.C. § 216(b).

232.     Premier violated, and is violating, the FLSA by employing non-exempt employees (Laribee and the other FLSA Collective Members) in a covered enterprise for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked after 40 in a workweek, including hours worked "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and/or during their "meal breaks."

233.     Premier's unlawful conduct harmed Laribee and the other FLSA Collective Members by depriving them of the overtime wages they are owed.

234.     Accordingly, Premier owes Laribee and the other FLSA Collective Members the difference between the overtime wages actually paid and the proper overtime wages actually earned.

235.    Because Premier knew, or showed reckless disregard for whether, its policies violated the FLSA, Premier owes these wages for at least the past 3 years.

236.    Premier is also liable to Laribee and the other FLSA Collective Members for an additional amount equal to all unpaid wages as liquidated damages.

237.    Finally, Laribee and the other FLSA Collective Members are entitled to recover all reasonable attorneys' fees and costs incurred in this action.

## COUNT II

### FAILURE TO PAY OVERTIME WAGES UNDER THE NYLL
### (NEW YORK CLASS)

238.    Laribee incorporates all other paragraphs by reference.

239.    Laribee brings his NYLL overtime claims as a class action on behalf of himself and the other New York Class Members pursuant to FED. R. CIV. P. 23.

240.    Premier's conduct violates the NYLL and its implementing regulations, NYLL §§ 190, *et seq.* and 650, *et seq.*; 12 NYCRR Part 142-3.2.

241.    At all relevant times, Premier was subject to the NYLL because Premier was (and is) a covered "employer" within the meaning of the NYLL. NYLL §§ 190(3) and 651(6).

242.    At all relevant times, Premier employed Laribee and each New York Class Member as its covered "employees" within the meaning of the NYLL. NYLL §§ 190(2) and 651(5).

243.    The NYLL requires employers, like Premier, to pay non-exempt employees, including Laribee and the other New York Class Members, overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked over 40 in a workweek. *See* NYLL §§ 190, *et seq.* and 650, *et seq.*; 12 NYCRR Part 142-3.2 and 142-3.14.

244.    Laribee and the other New York Class Members are entitled to overtime pay under the NYLL.

245.     Premier violated, and is violating, the NYLL by employing non-exempt employees (Laribee and the other New York Class Members) for workweeks longer than 40 hours without paying such employees overtime wages at rates not less than 1.5 times their regular rates of pay for all hours worked over 40 in a workweek, including hours worked "off the clock" before they arrived at their first assigned ticket, after they left their last assigned ticket, and/or during their "meal breaks." *See* NYLL §§ 190, *et seq.* and 650, *et seq.*; 12 NYCRR Part 142-3.2 and 142-3.14.

246.     Premier's unlawful conduct harmed Laribee and the other New York Class Members by depriving them of the premium overtime wages they are owed.

247.     In violating the NYLL, Premier acted willfully, without a good faith basis, and with reckless disregard of clearly applicable New York law.

248.     Thus, Premier's NYLL violations with respect to Laribee and the other New York Class Members were "willful" within the meaning of Section 198 of the NYLL. *See* NYLL § 198.

249.     Accordingly, Premier owes Laribee and the other New York Class Members the difference between the overtime wages actually paid and the proper overtime wages actually earned, plus interest on those amount, penalties, and attorneys' fees and costs. *See* NYLL §§ 198(4) and 663(1).

### COUNT III

#### FAILURE TO TIMELY PAY WAGES UNDER THE NYLL
#### (NEW YORK CLASS)

250.     Laribee incorporates all other paragraphs by reference.

251.     Laribee brings his NYLL claims as a class action on behalf of himself and the other New York Class Members pursuant to FED. R. CIV. P. 23.

252.     Section 191 of the NYLL requires employers, like Premier, to pay manual workers, including Laribee and the other New York Class Members, their lawfully earned wages weekly and not later than seven calendar days after the end of the week in which such wages are earned. *See* NYLL § 191(1)(a).

253.     NYLL § 191's timely payment of wages provisions and its supporting regulations apply to Premier and protect Laribee and the other New York Class Members.

254.     Premier violated, and is violating, the NYLL by failing to pay Laribee and the other New York Class Members on a timely basis. *See* NYLL § 191(1)(a).

255.     Premier's unlawful conduct harmed Laribee and the other New York Class Members by depriving them of their earned wages and the time-value of those earned wages they are owed.

256.     In violating the NYLL, Premier acted willfully, without a good faith basis, and with reckless disregard of clearly applicable New York law.

257.     Thus, Premier's NYLL violations with respect to Laribee and the other New York Class Members were "willful" within the meaning of NYLL § 198.

258.     In *Caul v. Petco Animal Supplies, Inc*, Judge Kovner of the Eastern District of New York held the NYLL's liquidated damages provisions are "designed to deter wage-and-hour violations in a manner calculated to compensate the party harmed." No. 20-CV-3534 (RPK)(SJB), 2021 WL 4407856, at *4 (E.D.N.Y. Sept. 27, 2021), *motion to certify appeal denied*, No. 20-CV-3534 (RPK)(SJB), 2021 WL 6805889 (E.D.N.Y. Dec. 22, 2021) (citing *Rana v. Islam*, 887 F.3d 118, 123 (2d Cir. 2018)).

259.     Accordingly, Laribee and the other New York Class Members are entitled to recover the amount of their untimely paid wages as liquidated damages, reasonable attorneys' fees and costs, and pre-judgment and post-judgment interest as provided for by NYLL § 198.

### JURY DEMAND

260.     Laribee demands a trial by jury on all Counts.

### RELIEF SOUGHT

WHEREFORE, Laribee, individually and on behalf of the other Hourly Utility Locators, seeks the following relief:

a. An Order designating this lawsuit as a collective action and authorizing notice to the FLSA Collective Members allowing them to join this action by filing a written notice of consent;

b. An Order certifying a class action pursuant to FED. R. CIV. P. 23;

c. An Order appointing Laribee as his counsel to represent the interests of the Hourly Utility Locators;

d. An Order finding Premier liable to Laribee and the other FLSA Collective Members for all unpaid overtime wages owed under the FLSA, plus liquidated damages in an amount equal to their unpaid wages;

e. An Order finding Premier liable to Laribee and the other New York Class Members their unpaid overtime wages owed under the NYLL;

f. An Order finding Premier liable to Laribee and the other New York Class Members for liquidated damages in the amount of the untimely wage payments pursuant to the NYLL;

g. Judgement awarding Laribee and the other Hourly Utility Locators all unpaid/untimely wages, unpaid overtime wages, liquidated damages, statutory damages, and any other penalties available under the FLSA and NYLL;

h. An Order awarding attorneys' fees, costs, and expenses incurred in this action;

i. Pre- and post-judgment interest at the highest applicable rates; and

j. Such other and further relief as may be necessary and appropriate.

Dated: December 21, 2023.

Respectfully submitted,

PELTON GRAHAM LLC

By: _P. E. P_____
          Brent E. Pelton
111 Broadway, Suite 1503
New York, New York 10006
Phone: (212) 385-9700
pelton@peltongraham.com

Michael A. Josephson*
Andrew W. Dunlap*
JOSEPHSON DUNLAP LLP
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
Phone: (713) 352-1100
Fax:     (713) 352-3300
mjosephson@mybackwages.com
adunlap@mybackwages.com

Richard J. (Rex) Burch*
BRUCKNER BURCH PLLC
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
Phone: (713) 877-8788
Fax:     (713) 877-8065
rburch@brucknerburch.com

*Pro hac vice applications forthcoming

ATTORNEYS FOR LARIBEE AND
THE HOURLY UTILITY LOCATORS

# EXHIBIT 1

<u>CONFIDENTIAL FAIR LABOR STANDARDS ACT EMPLOYMENT SERVICES CONSENT</u>

Print Name: __Christopher Michael Laribee_____

1.  I hereby consent to make a claim against __Premier Infrastructure & Energy, LLC_____ to pursue my claims of unpaid overtime during the time that I worked with the company.

2.  I designate the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC as my attorneys to prosecute and make decisions concerning my wage claims, the manner and method of conducting this litigation, the entering of an agreement with Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.

3.  I authorize the law firm and attorneys at JOSEPHSON DUNLAP, LLP and BRUCKNER BURCH PLLC to use this consent to file my claim in a separate lawsuit, class/collective action, or arbitration against __Premier Infrastructure & Energy, LLC_____.

4.  I understand that, by filing this Consent Form, I will be bound by the Judgment of the Court or arbitrator on all issues in this case.

Signature: _Christopher Michael Laribee (Dec 9, 2023 18:17 EST)_____    Date Signed: __Dec 9, 2023_____